**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEBRASKA**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | **8:07cr315** |
| **vs.** | ) | |
| | ) | **REPORT AND** |
| **RODNEY JOHNSON,** | ) | **RECOMMENDATION** |
| | ) | |
| **Defendant.** | ) | |

An evidentiary hearing was held December 19, 2007 and January 17, 2008 on the Motion to Suppress [23] filed by the defendant, Rodney Johnson. The final transcript was filed on January 24, 2008, and the matter was deemed submitted.

On August 23, 2007, Johnson was approached by interdiction officers at the Greyhound Bus Depot in Omaha, Nebraska. He alleges that all physical evidence and statements must be suppressed because the officers detained him without reasonable suspicion or probable cause; he was interrogated before being advised of his *Miranda* rights and in violation of his Fifth Amendment rights; the search warrant for his suitcase was not supported by probable cause; and his luggage was searched in violation of his Fourth Amendment rights.

The government argues that Johnson's initial contact with the officers at the bus station was consensual. The officers became suspicious that Johnson was engaged in criminal activity, based on his statements and demeanor during the consensual conversation. He was temporarily detained for a canine sniff of his suitcase. The dog positively alerted to

the odor of narcotics coming from the luggage.  Johnson was detained at the State Patrol's traffic office while the officers obtained a search warrant, during which time he made spontaneous and unsolicited comments to the officers.  A warrant was issued, the suitcase was searched, and the officers found 15 bottles containing over one kilogram of PCP. Defendant was then formally arrested, advised of and waived his *Miranda*[1] rights, and made more incriminating statements about his involvement in transporting the PCP.

### FACTUAL BACKGROUND

Nebraska State Trooper Alan Eberle testified that he has been employed by the Nebraska State Patrol (NSP) since July 1997.  He is currently a canine handler assigned to the commercial interdiction unit.  The commercial interdiction unit focuses on persons who use commercial means to conduct illegal activities.  In Omaha and the surrounding area, the unit monitors the Greyhound bus terminal, the Amtrak train station, the airports, Federal Express (FedEx), United Parcel Service (UPS), truck stops, and hotels and motels.

Depending on weather conditions and arrival times, the interdiction officers begin the day at the bus station and continue on to the train station.  They then go to FedEx or UPS, and follow-up with either hotel/motel or truck stop interdiction.  If possible, the officers also look at some of the outbound or incoming flights at the airport.

Eberle has been a canine handler for about seven years and has been working with his dog, a chocolate lab named Rocky, since April 2007.  Between April and July 2007, he

---

[1]*Miranda v. Arizona*, 384 U.S. 436 (1966).

attempted to train with Rocky on a daily basis going through specific modules which teach the dog odor memorization, scent memorization, and indication behavior. To achieve certification, Eberly and Rocky were presented with 14 "sniffs" or search areas and were evaluated by a trained judge regarding their ability to locate contraband. A final grade is given. To obtain certification, the dog and handler must pass "overall." The judge considers the dog's behavior, the handler's behavior, and the searching abilities and indication abilities of the canine. The judge then assigns an average grade, on a scale of one through six, with six being the worst. Eberle and Rocky passed the training course with an average of threes or above and received certification in July 2007. Rocky is a singular purpose dog, trained to locate the source of narcotics odors.

To maintain their certification, Eberle and Rocky are required to conduct weekly maintenance training; however, Eberle attempts to conduct that training with Rocky every other day if possible.

Eberle testified that the phrases "passive indicator" and "aggressive indicator" are terms for the behaviors that a trained canine exhibits when it locates the presence of the narcotic odors it has been trained to find. A passive indication dog will indicate passively, e.g., sit and stare, stand and stare, or lie down and stare at the area where the dog has sensed the odor of drugs or narcotics. An aggressive indication dog has been trained to either bite, bark or scratch at a location where the contraband odor is present. Eberle's dog, Rocky, was trained to be a passive indicator.

Turning to the terms "indication" and "alert," Eberle explained that a dog will alert within the area of an odor. Odors emanate from objects in a scent cone. When Rocky picks up the scent cone, he "alerts" in that his demeanor changes; he will begin sniffing heavily, and his behavior will change in his upper body and tail. The dog will work towards the strongest odor and will "indicate" as a final response. Rocky was trained to indicate by sitting or standing and staring at the area where he senses a narcotic odor. According to Eberle, Rocky has never refused to act when given the command to sniff for narcotics. In one instance, Rocky was repelled from a site by pepper or a masking agent.

In the early morning of August 23, 2007, Eberle was working at the Greyhound bus station in downtown Omaha. DEA Agent Paul Orduna was also present at the bus station. As Eberle was walking around a bus parked underneath an overhang on the side of the bus station, he saw interdiction Investigators Sattlefield and Scott talking to the defendant, Rodney Johnson. Eberle did not hear their conversation.

Defendant's bus had arrived between 5:30 and 5:40 a.m. (39:10-11). The bus company was in the process of transferring Johnson and other passengers from a bus with mechanical problems to another bus.

Eberle had worked with Sattlefield and Scott for some time and realized they were conducting an investigation. Eberle made eye contact with Sattlefield, who shouted out for Eberle to grab his dog. Eberle immediately went to his vehicle and got the dog, knowing that the bus drivers generally like to be out of the terminal by 6:15 a.m. Eberle testified on cross-

-4-

examination that he deploys his dog at the Greyhound bus station "[n]ot very often. Maybe two times a week, three times a week if possible." (43:22-23). Every time Rocky has indicated on a bag at the bus station, the officers have either physically found narcotics or were able to explain the presence of narcotic odors on the bag. (45:18-22).

Eberle stated that he retrieved Rocky from the unmarked unit and went to the front of the bus, which was parked on the southwest portion of the overhang.  At this point, Eberle had not had any personal contact with Johnson or the bag.  He then asked Investigator Sattlefield which bag was in question.  One of the investigators pointed out a bag that was suspect to them.  At Eberle's request, Scott placed some more bags out in the area so Rocky would not be just sniffing that bag by itself.  Eberle stated on cross-examination that three bags were taken off the bus and arranged near defendant's suitcase; the bags were three or four feet away from the bus with two or three feet between each bag.  (48:9-14).

After the bags were arranged, the officers began "stimming the canine," i.e., Scott acted as if he was going to hide a toy within the suitcases in order to draw the dog's attention to the suitcases.  Once Scott had walked around the suitcases, he stepped out of the area. Eberle then unleashed Rocky and allowed him to go and sniff the area where Scott had pretended to hide a toy.

According to Eberle, Rocky initially approached the first bay of the bus and began sniffing all the suitcases which were already stored underneath the bus.  He then went almost directly over to the bag under suspicion, began to sniff, and alerted to the presence of

narcotic odors all the way around the exterior portion of the suitcase. After Rocky began sniffing very heavily, he then sat and stared, indicating to Eberle that there was a presence of narcotic odors coming from either the inside or the outside portion of that suitcase.

Eberle took Rocky back to his vehicle and returned to the bus depot. Defendant had been handcuffed. (56:3-5). Eberle stated on cross-examination that Johnson was "pretty upset" or argumentative about the situation, and they may have "exchanged words" at that point; however, they had no actual conversation at that time. (54:1-6). Eberle explained to Johnson that he was being detained because there was a canine indication on his suitcase and they intended to apply for a search warrant. (54:21-55:5). Other officers prepared a search warrant application for the suitcase.

Investigator Sattlefield transported defendant to the NSP's traffic office in Omaha. (56:6-8). Ultimately, Eberle joined Sattlefield, Scott, DEA Agent Paul Orduna, and defendant Johnson at the traffic office. Eberle testified that he spoke to Johnson at the traffic office, as a matter of procedure, in order to verify Johnson's identity. Defendant produced a driver's license. Eberle then asked him a few follow-up questions about his Social Security number and his address for purposes of using the NCIC system. Eberle asked Johnson if he was on any medication, in case he had a condition requiring medication while he was detained at the NSP traffic office. He may have asked Johnson if he needed water, food, or drink. During this conversation, Johnson was handcuffed to a chair by his left wrist. The investigating officers were considering doing a controlled delivery, so Eberle also asked, for

safety purposes, if defendant was traveling with anyone else and whether he needed to make a phone call regarding the suitcase. (56:19-57:1). Eberle explained that if Johnson was traveling with another person, that individual would be aware that defendant did not get back on the bus and was arrested in Omaha. (63:10-18). In other words, the persons to whom delivery was to be made would be tipped off and could harm the officers during a controlled delivery.

Eberle also explained the warrant process because Johnson had a few questions about that. He told Johnson that if a warrant was issued for the suitcase, he would be placed under arrest if contraband or illegal items were found in the suitcase.

Eventually, Investigator Sattlefield approached Eberle and Johnson with a search warrant for the suitcase. Eberle testified he was present during a formal interview conducted by Sattlefield. He also participated in procuring samples of the PCP in the amounts required for prosecution.

Investigator Jason Scott testified that he has worked in the drug division of the Nebraska State Patrol for nine years. He has been a drug investigator with the commercial interdiction unit for about the past four years.

On the morning of August 23, 2007, Scott was working at the Greyhound bus station in downtown Omaha. The interdiction officers arrived at the bus station around 5:00 a.m. (91:20-23). Scott testified that he was in the unloading area, under the overhang at the south side of the bus terminal. He was dressed in plain clothes and was armed, but his weapon was

not exposed.  Scott stated he noticed Johnson because Johnson seemed interested in the undercarriage or luggage bays of the bus, and was circling around the bus.  This behavior was of interested to Scott because the area is where the bus is serviced and luggage transferred, and is generally off limits to passengers.  The passengers are supposed to go inside the terminal.  According to Scott, almost all passengers do go inside the terminal and are not interested in what goes on while the bus is stopped.  On this occasion, Johnson appeared to be alone (100:25) and was the only person who had any interest in the bus or luggage.  (73:3-15).

This particular bus had three luggage bays, all of which were open and contained luggage.  Scott testified he eventually contacted Investigator Sattlefield and asked if Sattlefield had noticed Johnson's behavior.  Sattlefield said he had noticed it and saw Johnson with a specific bag that was of interest.  Sattlefield pointed out the bag to Scott, who had not yet seen the bag.

Scott testified that he then went and looked at the bag, which was still under the bus in the middle bay with other luggage.  (73:16-25; 78:15-22).  He did not remove the bag from the bay at that time.  (78:13-16).  The bag was red and blue, and he could see it clearly although there were other bags in the middle bay.  It appeared to be brand new and had an aftermarket lock.  Scott noted that the baggage tag indicated the bag was coming from a "source city" to a "destination city," and there were no other bags associated with it.  (74:11-75:8).  The name on the tag, Robert Johnson, seemed nondescript to Scott.  Scott put

-8-

his nose right on the zipper of the bag (78:10) and found that the bag itself smelled like Vicks VapoRub.  (75:2-12).

It was significant to Scott that the bag appeared to be brand new because, in his experience, people often obtain the luggage for drug smuggling trips just prior to leaving. (76:1-2).  The presence of an aftermarket lock indicated there was an intentional trip made to purchase a lock, possibly of better quality, and that someone had great concern for the value of whatever was in the suitcase.  Scott stated he personally had never purchased an aftermarket lock for a suitcase.  (76:7-19).

According to Investigator Scott, Sattlefield had a "consensual encounter" with Johnson, while Scott stood nearby.  (79:16-19).  Scott testified he has worked with Sattlefield in commercial interdiction for about three years, and they are able to communicate nonverbally.  (81:17-19; 82:1-3).  In this instance, Scott saw Sattlefield take his wallet out of his pocket and, for that reason, believed that Sattlefield was getting ready to approach Johnson and identify himself as law enforcement.  That is their routine.  They make eye contact with another officer to make sure the other officer knows that an encounter is going to occur.  (82:1-25).  The conversation between  Sattlefield and Johnson occurred on the south side of the bus terminal, between the bus and the building, a couple of feet from the storage bay of the bus.  (80:1-25).  Sattlefield was in plain clothes with no weapon exposed. (83:9-15).  Scott was standing six to eight feet away and could not clearly hear the conversation between Sattlefield and Johnson.  (84:2-6).  At some point, Scott heard Johnson

-9-

say he didn't have the key.  Based on Johnson's body language and extreme nervousness, Scott believed he "had a pretty good indication of how things were going," even though he could not hear every word of the conversation. (85:7-20).  Sattlefield and Johnson began to walk around near the bus, and Scott followed them at a distance.  (85:13-25).  Investigator Scott recalled that Sattlefield eventually had to point the bag out to Johnson, who was not going to claim it.  Scott saw Sattlefield point directly to the red and blue bag and ask Johnson if it was his.  The statement about the key occurred after the bag was claimed.  (86:2-11).

Scott approached Sattlefield and Johnson and listened to their conversation.  Based on Sattlefield's "nonverbals" and the pieces of conversation that Scott heard, it was apparent to Scott that Johnson did not want to claim the bag.  Defendant kept circling the bus with the bag right there and did not claim it until it was pointed out to him.  Then, there was the conversation about not having a key and not owning the contents of the bag.  (86:16-87:4).

Scott testified that Johnson was placed in handcuffs in the area underneath the overhang outside the bus terminal.  (87:9-19).  Investigator Eberle deployed his dog on the bag, received a positive indication, and they obtained a search warrant for the bag and detained Johnson.  (87:21-88:1).  After defendant was handcuffed, he made statements to the effect of disclaiming the bag, e.g., the bag was not his, the bag was given to him, or he did not know what was in the bag.  (88:5-8).  Scott described Johnson as "extremely nervous, borderline passing out."  His knees were shaking terribly, his breathing was heavy and his hand were shaking.  (88:11-14).

-10-

According to Scott, Sattlefield asked Eberle to get the dog.  Since Scott was a former dog handler, he placed Johnson's bag next to the bus with three or more items of luggage, to be presented to the dog.  The bags were placed right next to the bus, in a line, with a couple of feet between each bag.  (111:9-12).  He then watched Eberle deploy the dog.  (90:2-22).  It did appear that the dog placed its nose close to each of the bags.  (112:5-8).  On cross-examination, Scott testified that he watched the dog sniff all the bags and then concentrate on the bag in question by spending more time with the bag, becoming "very nasal," staring at the bag, and not leaving the bag.  (113:8-13).

Later that morning, Johnson was transported to the NSP office and Sattlefield procured a search warrant.  According to Scott, Johnson was detained at this point, but had not been placed under arrest.  (92:2-23).  He was held in an interview room and fell asleep under the table.  Scott was in the room with Johnson.  Scott testified that Johnson started talking to him and, eventually, Scott responded to Johnson.  Scott had not advised Johnson of his *Miranda* rights.  (93:3-94:23).  On cross-examination, Scott testified that based on the existing paperwork and the number of officers who had spent time with Johnson, he thought Johnson had already been given his *Miranda* warnings; however, he did not ask Johnson about it, as his job was to just "babysit" Johnson, not to interview him.  (115:14-116:25).

As they were sitting in the interview room, Johnson woke up, pulled the covers off, said, "hey, weren't you the one at the bus station?" and then struggled with the verbiage of his question.  Scott asked him, "down at the bus station?"  Johnson then said, "weren't you

the one that said you knew the stuff in the bag wasn't mine?"  Scott replied that he wasn't asking Johnson anything at the bus station and said, "I told you that my opinion was you were being paid to transport what was in the bag."  (95:1-14).  Johnson then told Scott how he came in contact with the bag, what he was supposed to do with it, and the procedure for delivering the bag to Chicago.  Scott testified he did not say one word to Johnson until Johnson began talking about Chicago.  Only after Johnson told Scott how he delivered it, what kind of key words were said, and how the recipient was going to be dressed did Scott ask Johnson a question, i.e., how he was going to be paid.  Johnson answered the question and continued to speak to Scott.  They spoke to each other for several minutes.

Scott acknowledged on cross-examination that he asked questions of Johnson about how much he got paid for the trip, if he had previously seen the person who supplied the suitcase, how the people in Chicago would know what he was wearing when he made the delivery, how much product was in the suitcase, charges pending against him in Tennessee, how he came into possession of the bag at a hotel, whether he was staying at the hotel, how he got in contact with these people from California, whether they gave him front money and bought his bus ticket, whether any of his belongings were in the suitcase, whether the suitcase was already locked when it was dropped off, and whether Johnson had made this trip to Chicago before.  (117:6-121:1).  Scott also talked to Johnson about possibly getting the suitcase to Chicago.  Scott stated on cross-examination that he did not consider his questions to be a custodial interrogation, as they were questions with no answer given, "taken out of

a conversation that Mr. Johnson initiated with me and I was clarifying." (121:17-21). Scott explained on redirect that Johnson began to explain on his own accord what he was supposed to do with the bag, how he got the phone number, what the guy would be wearing, and what their conversations would be like. (123:5-8). Scott asked a follow-up question only after Johnson mentioned delivering the bag to Chicago. Scott testified he wanted to determine whether Johnson was being honest about that, and he had assumed another officer had read Johnson his *Miranda* rights. (123:20-124:9).

This conversation was recorded on videotape. (Ex. 1[2]).

Their conversation ended when Sattlefield entered the room with the search warrant. (95:16-96:19). Scott testified he smelled a strong odor of Vicks VapoRub when Sattlefield opened the bag. (97:9-23). The contents, hazardous substances, were taken to the garage. (98:24-99:1). Sattlefield was preparing to conduct a formal interview when he leaned over towards Scott and asked whether Johnson had been Mirandized. Scott replied that he did not know, but assumed he was. Sattlefield then left the room, returned with a form, read Johnson his *Miranda* warnings, and conducted the interview. (124:2-125:2). Johnson told Sattlefield he understood each of his rights. He initialed the form as requested, and signed the waiver

---

[2]Johnson's confinement in the interview room was recorded on surveillance tapes (Exhibits 1 & 2), and the court has reviewed the videotapes. The camera was aimed at the defendant, who was sitting at a rectangular conference table. The officers present in the room are not always visible. For purposes of this Motion to Suppress, the court has paid particular attention to the last 80 minutes on Exhibit 1.

of rights at the bottom of the form.  *See* Ex. 4.  These events are recorded at approximately

two hours and 55 minutes into Exhibit 1.

Scott testified that he did not pass along to Sattlefield any of the information he had

obtained from Johnson during their previous conversation.  (125:3-11).

Investigator Anthony Sattlefield testified that he has been employed by the Nebraska

State Patrol for over 12 years.  On August 23, 2007 he was assigned to the commercial

interdiction unit and was working at the Greyhound bus station in Omaha.  Between 5:30 and

5:45 a.m. he was looking  at the cargo compartment of a bus and noticed a red and blue new-

looking suitcase with an aftermarket lock.  At that time, the majority of bus passengers were

inside the passenger terminal (132:1-25), but defendant Johnson was still outside, walking

around the loading platform.  (133:5-7).  Sattlefield noticed the bag before he noticed

Johnson.  (133:24).  Generally, bus passengers are told to set their bags in front of the bus

and baggage handlers are supposed to load the suitcases into the cargo compartments.

(168:17-21).   Sattlefield recalled Johnson placing this particular bag right next to the bus,

next to the cargo compartment.  (138:15-21; 169:21-24).  When Sattlefield went by later, the

bag was actually in the cargo compartment.  (174:10).

Regarding the appearance of the bag, Sattlefield explained that people transporting

drugs usually do not know how much there will be or when it will arrive; therefore, they have

to purchase a suitcase to conceal the drugs.  The presence of an aftermarket lock shows that

-14-

the person took an extra step to obtain a better, sturdier lock to secure the contents. (134:3-18).

Sattlefield went up to get a closer look and noticed a strong odor emanating from the bag that was consistent with a masking agent. (134:22-135:7). He smelled it from about 12 inches away. (175:3). At that time, Sattlefield told Investigator Scott he was interested in that bag. Sattlefield also recalled that Johnson was the person who set the bag down for it to be loaded onto the bus. (135:11-16). Sattlefield located Johnson, who was walking around the bus in a circular pattern. Sattlefield noticed that the suitcase had a Greyhound computer-generated luggage tag bearing the name "Robert Johnson," but no contact information. He had to turn the tag to read it. (175:7-8). There was no handwritten luggage tag attached to the suitcase. (136:2-137:6). The computer-generated tag indicated that the bag was coming from a drug source area, California, and going to Chicago, a destination area for drugs. (137:7-15).

This combination of factors aroused Sattlefield's suspicions, and he made what he described as a consensual contact with Johnson on the passenger side of the bus under the overhead platform, about 15 feet away from the bus. (138:4-139:3). Sattlefield testified that he walked up to Johnson, identified himself as a law enforcement officer, and advised Johnson that he was not under arrest or in any type of trouble. Sattlefield asked Johnson if he had time to speak to him. Johnson replied that he did, and his demeanor was polite and cooperative. Johnson appeared to understand Sattlefield's questions. (139:5-14). Investigator Scott was within hearing distance when Sattlefield approached Johnson.

-15-

Sattlefield testified that he first asked to see Johnson's bus ticket and identification. The ticket was a one-way ticket and was purchased with cash on the same day of travel. Officers look for cash purchases because cash affords anonymity to individuals involved in criminal activity.  The purchase of a one-way ticket is of interest because drugs are usually transported on the spur of the moment.  Drug couriers typically purchase their tickets at the last minute and do not know when they will be returning, so they purchase one-way tickets. (140:6-141:3). Johnson also produced a Washington D.C. driver's license issued to Rodney Johnson.  The name on the luggage tag was Robert Johnson.  The conflicting names served as another indication that something was amiss.  (141:4-17).

At this point, Johnson was not being detained and was not in custody.  (141:18-23). Sattlefield returned Johnson's identification and ticket and began asking him about his travel circumstances.  Johnson told Sattlefield that he had been in California visiting relatives. Because Johnson had a Washington, D.C. driver's license, Sattlefield asked him why he had a ticket to Chicago.  Johnson stated that once he got to Chicago he was going to purchase another ticket to go to Michigan to visit relatives.  Sattlefield thought that Johnson's travel circumstances were unusual.  (142:2-18).

Sattlefield testified he then explained to Johnson what his duties were down at the bus station, i.e., they were there to look for criminal activity and people transporting things such as guns, drugs, knives, bombs, or hazardous chemicals or devices.  He asked Johnson if he

had anything contraband or illegal on his person.  Johnson stated he did not, and his demeanor did not change noticeably.  (142:20-143:6).

Sattlefield then asked Johnson for consent to search him and his luggage.  Johnson reportedly said yes (146:17-18), and told Sattlefield that he had a suitcase on the bus and some bags inside the terminal.  Johnson then went into the passenger terminal to retrieve those bags.  He returned to Sattlefield and they continued with the conversation.  (143:8-24).  Sattlefield asked Johnson if he could point out the suitcase that was on the bus.  There were not very many bags on the bus.  Johnson started looking into the bus, as if looking for the luggage, but he was not claiming the luggage.  (144:10-25).  Johnson began to get increasingly nervous.  He walked around the bus and began to pace about.  At that point, Sattlefield pointed the bag out to Johnson and asked if the bag belonged to him.  Johnson said that it did.  By this time, Johnson's legs were visibly shaking, he could hardly walk, and he was pacing about.  (145:10-25).

Sattlefield testified he became concerned that Johnson would flee, so he removed the bag from the bus (175:12-16) and asked Johnson if he had the key.  Johnson, who appeared to calm down a little bit, stated that he did not have the key.  (146:4-12).  Sattlefield asked how Johnson planned to get into the bag once he got to his destination.  Johnson stated that he was going to cut the lock.  Sattlefield then informed Johnson that they could get into the suitcase without causing any damage to the lock or the suitcase, and would he mind if they

-17-

did that. Johnson stated, "no," and began to get more nervous. He fidgeted and paced around. (147:18-148:1).

Johnson denied that he had anything illegal on his person and stated it would be OK if Sattlefield searched him. Johnson turned, placed his body away, and stuck his hand in his right front pocket. Sattlefield testified he became concerned that Johnson had a weapon or was going to destroy evidence, so he asked Johnson to remove his hand from his pocket. Sattlefield testified that he had to physically remove Johnson's hand from the pocket but did not place him in handcuffs at that time. (148:3-21).

After Sattlefield removed Johnson's hand from the pocket, Johnson started objecting that they did not have probable cause to search him. He protested as to why they were talking to him or why they picked him. According to Sattlefield, Johnson was highly agitated, could not stand still, and became tense. Once Johnson started to tense up, Sattlefield thought he was going to fight or flee and felt the need to handcuff Johnson, who was protesting out loud. After placing Johnson in handcuffs, Sattlefield advised that he would be detained for a canine and they were going to have a canine sniff the bag. (149:7-25).

Investigator Eberle was asked to retrieve his dog to sniff the suitcase. The dog was in Eberle's car, which was parked on the street next to the bus station. It took Eberle about two minutes to retrieve the dog. The dog alerted to the suspect bag about four minutes after Johnson was detained. (150:1-151:4). During this time, Johnson continued protesting and

-18-

began disassociating himself from the suitcase.  He gave consent for them to search his duffel bag, but would not give consent for the suitcase.  (151:7-23).

Sattlefield acknowledged that he was not a trained dog handler but had worked with this dog before and knew how the dog indicated.  After the canine sniff, Sattlefield believed there were drugs in the suitcase.  He told Johnson they were going to take him to the traffic office and Sattlefield was going to apply for a search warrant.

Investigator Sattlefield testified that he transported Johnson to the State Patrol traffic office.  Johnson continued protesting, pointing out that the name on the luggage tag was Robert Johnson and his name was Rodney Johnson. He became so agitated that Sattlefield told him to be quiet or shut up.  (152:4-153:8; 178:24-179:8).  Johnson was not being questioned when he made these statements to Sattlefield. (153:11).  He did stop talking after Sattlefield told him to be quiet.  (179:9-11).

At the traffic office, Sattlefield handed off Johnson to DEA Special Agent Paul Orduna. Johnson was taken to the interview room for "babysitting," and Sattlefield typed the search warrant application.  Sattlefield stated that it took about an hour and a half to prepare the search warrant application, and he had to go back downtown to present it to the judge. Orduna, Eberle and Scott were left to babysit Mr. Johnson.  (154:1-10).

Johnson's confinement in the interview room was videotaped.  Sattlefield noted that Johnson was offered water several times.  He was tired, so they gave him a blanket and pillow so he could rest on the floor, and Johnson did appear to sleep.

-19-

When Sattlefield returned with the search warrant and entered the interview room, Johnson was talking to Investigator Scott. Sattlefield testified that they appeared to be talking about a controlled delivery. It seemed like Johnson's demeanor had changed; he now appeared to be cooperating. Sattlefield stated that he interrupted the conversation because he wanted to advise Johnson that he had the warrant. (155:1-25).

The officers opened the suitcase and found 15 liters of PCP, which is a hazardous chemical. Sattlefield, Eberle and Scott took the PCP out to the garage. Sattlefield returned to the interview room, where there were officers posing questions to Johnson. (156:4-23).

According to Investigator Sattlefield, Johnson was now very talkative. He would start talking and people would respond with follow-up questions. Sattlefield was not sure how long Johnson had been talking. As Sattlefield reviewed the paperwork, something – possibly the absence of a form – prompted him to ask Scott whether Johnson had been read his *Miranda* rights. Scott replied that he did not know. Sattlefield testified he had assumed *Miranda* warnings were already given because Johnson was talking; however, he was not sure. (182:4-183:4). Sattlefield went to get a *Miranda* form as soon as he found out that Scott had not Mirandized Johnson. (157:11-158:20).

Sattlefield testified that he completed the top portion of the *Miranda* rights form (Ex. 4) and read the form to Johnson, making sure that Johnson gave a verbal indication that he understood each item. (159:4-25). After reading the form aloud, Sattlefield gave the form to Johnson and had him initial at each line. As for Johnson's demeanor, Sattlefield testified

it was clear that Johnson understood his rights and wanted to talk.  (160:3-23).  Johnson also read a copy of the search warrant while being advised of his *Miranda* rights.  It appeared to Sattlefield that Johnson had heard his *Miranda* rights before.  (161:8-14).

After *Miranda* warning were completed, Johnson stated that every 10 days in Washington, D.C., he would get a telephone call on a prepaid cell phone from someone in California who told him when he needed to be out in California.  Johnson would find a way to pay for a flight out to California.  He stayed at a hotel near the Los Angels airport and called the number given him when he was contacted in Washington, D.C. and told them he had arrived in California.  Johnson would then take a "rider" or bootleg cab out to San Bernardino, where he would get a hotel room across the street from the San Bernardino Greyhound bus terminal.  Johnson would then call to let them know his room number.  About 20 minutes later, someone would drop off a suitcase.  Johnson told Sattlefield that this was his fourth trip; he had made two trips to Chicago, one to Des Moines, Iowa and one to Toledo, Ohio.  (162:1-25).

Once Johnson received the suitcase in Los Angeles, he would contact other people, giving them a description of what he was wearing, his bus itinerary, and when he would arrive.  He was instructed to use pay phones and destroy all the telephone numbers, and then get on the bus and go to Chicago.  Once in Chicago, Johnson was supposed to go outside and sit on a ledge along the taxi stand and wait for an individual dressed just like him to approach.  They would give a Muslim greeting.  If the person used the correct reply, Johnson

would exchange the suitcase for an envelope containing $1,000, and he would make his way back to Washington, D.C.  (163:1-20).

Sattlefield testified he has interviewed over 100 arrestees and did not consider it difficult to obtain information from Johnson.  He described Johnson as being "free with talking," and one did not have to extract information from Johnson.  "He basically talks and basically you just kind of listen and you kind of just ask follow-up questions."  (165:3-11).  Normally, the police have to ask specific questions and extract the information piece by piece from individuals.

At no point, before or after *Miranda* warning were given, did Johnson ask that any questioning stop.  Nor did Johnson ever ask for an attorney.  No one had any difficulty understanding or communicating with Johnson, and he did not appear to be under the influence of drugs or alcohol.  (165:15-166:4).

Sattlefield stated that he did not recall any conversation or discussion with Investigator Scott about the conversation he had with Johnson prior to Sattlefield arriving with the search warrant.  Scott did not advise Sattlefield about any details of the conversation.  (166:5-16).

## LEGAL ANALYSIS

### A.  Initial Contact at the Bus Depot

Encounters between the police and citizens fall into three general categories: (1) consensual or voluntary encounters, which are not seizures and do not implicate the Fourth

Amendment, *see, e.g., Florida v. Bostick*, 501 U.S. 429 (1991); *Florida v. Royer*, 460 U.S. 491 (1983); (2) investigative detentions, which are seizures of limited scope and duration within the meaning of the Fourth Amendment and must be supported by a reasonable articulable suspicion of criminal activity, *see, e.g., Terry v. Ohio*, 392 U.S.1 (1968); *Reid v. Georgia*, 448 U.S. 438 (1980); *United States v. Sokolow*, 490 U.S. 1 (1989); and (3) physical arrests, which must be supported by probable cause. *See generally United States v. Johnson*, 326 F.3d 1018, 1021 (8th Cir.), *cert. denied*, 540 U.S. 962 (2003).

The court finds that the initial contact between Johnson's and Investigator Sattlefield was consensual. "For example, 'law enforcement officers do not violate the Fourth Amendment by merely approaching an individual on the street or in another public place, by asking him if he is willing to answer some questions, [and] by putting questions to him.'" *United States v. Favela*, 247 F.3d 838, 840 (8th Cir.), *cert. denied*, 534 U.S. 998 (2001) (quoting *Florida v. Royer*, 460 U.S. at 497). That is what happened in this case. Sattlefield approached Johnson, identified himself as a police officer and told Johnson he was not in any kind of trouble or under arrest. Sattlefield was dressed in plain clothes with no weapon displayed. While other plain clothes officers were in the general area, they did not make their presence known to Johnson at that time. I find credible Sattlefield's testimony that Johnson agreed to talk to Sattlefield outside the bus station, voluntarily provided identification and ticket information, and answered Sattlefield's questions about his travel itinerary. The court

further finds that Johnson voluntarily consented to have Sattlefield search his person and any luggage Johnson had placed inside the bus terminal.

### B. Investigative Detention

Johnson continued to talk to Sattlefield, but became nervous and evasive when Sattlefield began asking him about the red and blue suitcase. Sattlefield had previously observed Johnson with the suitcase and noted that certain factors (new suitcase with aftermarket lock, limited information on luggage tag, source and destination, purchase of one-way ticket with cash on the day of travel, Johnson's unusual interest in watching the bus) suggested that Johnson was involved in criminal activity. Although Johnson had given Sattlefield permission to search his person, Johnson would not remove his hand from his pants pocket, became agitated and tense, and began protesting that Sattlefield did not have probable cause to search him.

Under *Terry v. Ohio*, 392 U.S. at 21-22, a police officer may conduct an investigative stop if the officer has a reasonable suspicion that the person stopped is, or is about to be, engaged in criminal activity. Reasonable suspicion requires a particularized and objective basis for suspecting the person stopped of criminal activity, but the level of suspicion required for a *Terry* stop is less demanding than that for probable cause. *United States v. Gonzalez*, 220 F.3d 922, 925 (8th Cir. 2000) (internal quotations and citations omitted). "A reasonable suspicion may be justified even if there are innocent explanations for a defendant's behavior when the circumstances are considered in the totality." *United States*

*v. Tuley*, 161 F.3d 513, 515 (8th Cir. 1998).  Whether an officer had reasonable suspicion to detain an individual for investigation is determined by examining the totality of the circumstances, in light of the officer's experience.  *See United States v. Sanchez*, 417 F.3d 971, 975 (8th Cir. 2005).

Under the circumstances presented in this case, the court finds that Investigator Sattlefield, an experienced interdiction officer, had reasonable suspicion to detain Mr. Johnson for further investigation.  Shortly thereafter, Investigator Eberle's dog indicated to the presence of a narcotic odor coming from Johnson's suitcase.  Defendant Johnson did not allow the officers to search the blue and red suitcase; therefore, he was detained while Sattlefield procured a search warrant.

### C.  Probable Cause for Search Warrant

For the reasons discussed above, the court must reject Mr. Johnson's assertion that the search warrant for his suitcase was based on information the officers obtained in violation of his constitutional rights.

Turning to Johnson's argument that the search warrant was not issued upon probable cause, an issuing judge must simply "make a practical, common-sense decision whether, given all the circumstances set forth in the affidavit before him, including the 'veracity' and 'basis of knowledge' of persons supplying hearsay information, there is a fair probability" that evidence of a crime would be present.  *See Illinois v. Gates*, 462 U.S. 213, 238 (1983).  The duty of this court, as a reviewing court, is simply to "ensure that the magistrate or issuing

judge had a 'substantial basis for ...  conclud[ing]' that probable cause existed." *Illinois v. Gates*, 462 U.S. at 238-39 (quoting *Jones v. United States*, 362 U.S. 257, 271 (1960)).  Great deference is afforded the issuing judge's determination of probable cause.  *Illinois v. Gates*, 462 U.S. at 236.

The significance of the dog's positive indication is governed by *United States v. Donnelly*, 475 F.3d 946, 955 (8th Cir.), *cert. denied*, 127 S. Ct. 2954 (2007):

> Assuming that the dog is reliable, a dog sniff resulting in an alert on a container, car, or other item, standing alone, gives an officer probable cause to believe that there are drugs present.  *United States v. Sundby*, 186 F.3d 873, 875-76 (8th Cir. 1999).  In finding sufficient the affidavit at issue in *Sundby*, we declared that "[in order to establish the dog's reliability,] the affidavit need only state the dog has been trained and certified to detect drugs.... An affidavit need not give a detailed account of the dog's track record or education." *Id*. at 876 (citations omitted).  Such statements only establish the affidavit's facial validity, however. *Id*. (holding that the defendant would have been entitled to a *Franks* hearing had he shown that officers withheld negative information casting into doubt the dog's reliability).

The search warrant application (Ex. 3) advises that

> The canine sniff of the above described suitcase conducted by Inv. Eberle and his Police Service Dog "Rocky", resulted in a positive indication for drugs. Inv. Eberle and his Police Service Dog "Rocky" were last certified on 07-07-07.  Police Service Dog "Rocky" has been deployed 180 times.  Of the 180 times "Rocky" has been deployed he has indicated 174 times.  Of the 174 times "Rocky" has indicated drugs have been located 174 times.

Considering the totality of the circumstances set forth in the affidavit, and giving deference to the issuing judge, I find the affidavit contained a factual basis sufficient to create a fair probability that evidence of a crime would be found in the defendant's suitcase.

In the alternative, I find that the good faith exception of *United States v. Leon*, 468

-26-

U.S. 897 (1984), applies to this search warrant.  In *Leon*, the Supreme Court recognized that "the exclusionary rule is designed to deter police misconduct rather than to punish the errors of judges and magistrates." *Id*. at 916.  Accordingly, evidence obtained pursuant to a search warrant should not be excluded where the officers executed the warrant "with an objectively reasonable reliance on the magistrate's determination of probable cause." *United States v. Riedesel*, 987 F.2d 1383, 1391 (8th Cir. 1993).  In this case, the officers' reliance on the search warrant was objectively reasonable.

### D.  Suppression of Statements; *Miranda*

Defendant contends he was interrogated in violation of *Miranda v. Arizona* and that the statements he made after being given his *Miranda* rights should be suppressed pursuant to *Missouri v. Seibert*, 542 U.S. 600, 124 S. Ct. 2601 (2004).

*1.  Miranda.*  The protections of *Miranda v. Arizona* are triggered when a defendant is (1) in custody and (2) being interrogated.  *United States v. Lawrence*, 952 F.2d 1034, 1036 (8th Cir.), *cert. denied*, 503 U.S. 1011 (1992).  'Interrogation' is 'express questioning,' or words or actions 'that the police should know are reasonably likely to elicit an incriminating response....'  *Rhode Island v. Innis*, 446 U.S. 291, 301 (1980); *Lawrence*, 952 F.2d at 1036...."  *United States v. Hatten*, 68 F.3d 257, 261-62 (8th Cir. 1995), *cert. denied*, 516 U.S. 1150 (1996) (parallel citations omitted).

Routine biographical data is exempted from *Miranda*'s coverage.  *See Pennsylvania v. Muniz*, 496 U.S. 582, 601 (1990); *United States v. Brown*, 101 F.3d 1272, 1274 (8th Cir.

-27-

1996).  The officers did not act improperly by asking Johnson for biographical information or by asking him whether he would require any medication while he was detained at the NSP traffic office.

The statements of major concern were made in response to questions asked by Investigator Scott after Johnson woke up in the interview room.  In response to Johnson's volunteered inquiry, Scott stated, "I told you that my opinion was you were being paid to transport what was in the bag."  Johnson then volunteered information about delivering the bag to Chicago.  Scott then began asking Johnson questions about the details of the delivery – questions which Scott should have known were reasonably likely to elicit incriminating responses.  Although Scott characterized his obvious solicitation of incriminating statements as mere "followup" to Johnson's volunteered information, the court finds that Scott interrogated Johnson, who had not yet been given his *Miranda* warnings.  There does not appear to be any factual basis for Scott's assumption that somebody else had already read Johnson his rights, and Scott should not have questioned Johnson without first determining whether Johnson had been given and waived his *Miranda* rights.  Thus, the court finds that Johnson's responses to questions asked by Investigator Scott or any other officer, between the time Johnson began talking about the delivery to Chicago and the time Johnson signed his *Miranda* waiver, should be suppressed.

To the extent Johnson's motion seeks the suppression of physical evidence based on this *Miranda* violation, the failure to give a suspect *Miranda* warnings does not require the

suppression of the physical fruits of the suspect's unwarned but voluntary statements.  *United States v. Patane*, 542 U.S. 630 (2004).  The record shows no indication of coercion or police misconduct in talking to Mr. Johnson, and I find that all of Johnson's statements were voluntary for purposes of applying *United States v. Patane*.

**2.  *Missouri v. Seibert*.**  In light of the incriminating statements elicited by Investigator Scott, Johnson contends that his Mirandized statements should also be suppressed as part of an illegal two-part interrogation.  In *Missouri v. Seibert*, 542 U.S. 600, 124 S. Ct. 2601 (2004), the Court disapproved of a "question-first" interrogation technique where police deliberately fail to provide *Miranda* warnings before an initial round of questioning until they elicit a confession from the suspect and then seek to have the suspect repeat the confession in a second interview conducted after *Miranda* warnings are given.  "The object of question-first is to render *Miranda* warnings ineffective by waiting for a particularly opportune time to give them, after the suspect has already confessed."  *Seibert*, 542 U.S. at 601, 124 S. Ct. at 2610.

> The threshold issue when interrogators question first and warn later is thus whether it would be reasonable to find that in these circumstances the warnings could function "effectively" as *Miranda* requires.  Could the warnings effectively advise the suspect that he had a real choice about giving an admissible statement at that juncture? Could they reasonably convey that he could choose to stop talking even if he had talked earlier? For unless the warnings could place a suspect who has just been interrogated in a position to make such an informed choice, there is no practical justification for accepting the formal warnings as compliance with *Miranda*, or for treating the second stage of interrogation as distinct from the first, unwarned and inadmissible segment.

-29-

*Seibert*, 524 U.S. at 611-612, 124 S. Ct. at 2610.  The Court further reasoned that

> when *Miranda* warnings are inserted in the midst of coordinated and
> continuing interrogation, they are likely to mislead and "depriv[e] a defendant
> of knowledge essential to his ability to understand the nature of his rights and
> the consequences of abandoning them." *Moran v. Burbine*, 475 U.S. 412, 424
> (1986).  By the same token, it would ordinarily be unrealistic to treat two
> spates of integrated and proximately conducted questioning as independent
> interrogations subject to independent evaluation simply because *Miranda*
> warnings formally punctuate them in the middle.

524 U.S. at 601, 124 S. Ct. at 2611.  In other words, a suspect who has already revealed all

may well waive *Miranda* rights in the mistaken belief that his or her non-Mirandized

statements were already admissible.

The plurality opinion in *Seibert* "described the controlling question as whether 'a

reasonable person in the suspect's shoes' would have understood the *Miranda* warnings as

conveying a message that the suspect retained a genuine choice about continuing to talk."

*United States v. Terry*, 400 F.3d 575, 581 (8th Cir. 2005) (quoting *Seibert*, 124 S. Ct. at

2612-13).  Factors relevant to that inquiry include "the completeness and detail of the

questions and answers in the first round of interrogation, the overlapping content of the two

statements, the timing and setting of the first and the second, the continuity of police

personnel, and the degree to which the interrogator's questions treated the second round as

continuous with the first," *Seibert*, 542 U.S. at 615, 124 S. Ct. at 2612, and whether, as

happened in *Seibert*, "questioning was systematic, exhaustive, and managed with

psychological skill." *Id*. at 616, 124 S. Ct. at 2612.

-30-

To a large extent, the *Seibert* factors technically weigh in favor of Mr. Johnson; however, the conduct of this interrogation does not resemble the interrogation technique discussed in *Seibert*. The record in this case does not suggest there was any "police strategy adapted to undermine the *Miranda* warnings" or show that the non-Mirandized questioning "was systematic, exhaustive, and managed with psychological skill."

In this instance, the prosecution bears the burden of establishing by a preponderance of the evidence that Investigator Scott's failure to provide *Miranda* warnings at the outset of his interrogation was not deliberate. *See United States v. Torres-Lona*, 491 F.3d 750, 758 (8th Cir. 2007), *cert. denied*, 128 S. Ct. 927 (2008); *United States v. Ollie*, 442 F.3d 1135, 1142-43 (8th Cir. 2006). The court finds that the government has met this burden.

The videotape (Exhibit 1) tends to corroborate the testimony of all the officers and verifies that Johnson did initiate the conversation with Scott. The court finds credible Scott's testimony that he thought some other officer had already given Johnson his *Miranda* rights, as Johnson was actually arrested and transported by Sattlefield and there were several other officers present at the NSP traffic office and in the interview room. On the videotape, Scott's questions to Johnson do appear to be spontaneous and conversational. Most of the statements were made before Sattlefield interrupted the interrogation by entering the room with the search warrant. Sattlefield then Mirandized the defendant, who appears on tape to have been very willing to waive his *Miranda* rights and talk to the officers at length.

-31-

The court finds the investigating officers made no calculated effort to circumvent *Miranda* requirements; therefore, the admissibility of Johnson's Mirandized statements is governed by *Oregon v. Elstad*, 407 U.S. 298 (1985). *United States v. Torres-Lona*, 491 F.3d at 757-58. Under this standard, a post warning confession is admissible so long as it was knowingly and voluntarily made. *Id.* at 758. Based on the officers' behavior, Johnson's demeanor, and the conditions under which Johnson was detained, as depicted in Exhibits 1 and 2, the court finds that Johnson fully intended to cooperate with the officers, all of his statements were knowingly and voluntarily made, and his Mirandized statements should not be suppressed.

## RECOMMENDATION

**IT IS RECOMMENDED** that the defendant's Motion to Suppress [23] be granted in part, and denied in part, as follows:

1.     The motion should be granted as to the defendant's responses to questions asked by Investigator Scott or any other officer, between the time Johnson began talking about the delivery to Chicago and the time Johnson signed his *Miranda* waiver.

2.     The motion should be denied in all other respects.

Pursuant to NECrimR 57.3, a party may object to this Report and Recommendation by filing an "Objection to Report and Recommendation" within ten (10) business days after being served with the recommendation. The statement of objection shall specify those portions of the recommendation to which the party objects and the basis of the objection. The objecting party shall file contemporaneously with the statement of objection a brief setting

forth the party's arguments that the magistrate judge's recommendation should be reviewed *de novo* and a different disposition made.

**DATED February 20, 2008.**

**BY THE COURT:**

**s/ F.A. Gossett**
**United States Magistrate Judge**